## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **JEREMY HITT,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | Case No.:  **2:21-CV-1720-RDP** |
| | } | |
| **CSX TRANSPORTATION, INC.,** | } | |
| | } | |
| **Defendant.** | } | |

## <u>MEMORANDUM OPINION</u>

In this case, Plaintiff Jeremy Hitt has sued his former employer Defendant CSX. He claims CSX retaliated against him in violation of the Federal Rail Safety Act ("FRSA"). This matter is currently before the court on Defendant CSX Transportation, Inc.'s Motion for Summary Judgment. (Doc. # 26). The Motion has been fully briefed. (Docs. # 32, 38, 44). After careful review, and for the reasons discussed below, Defendant's Motion for Summary Judgment (Doc. # 26) is due to be granted.

**I.     Background[1]**

**A.     Plaintiff's Employment at CSX**

Plaintiff Jeremy Hitt was employed by Defendant CSX from 2005 to January 2019. (Doc. # 31-13 at 5). Over the course of his nearly fifteen years working for Defendant, he served as a conductor, a remote-control operator ("RCO"), and a foreman. (*Id.*). At all times relevant to

---

[1] The facts set out in this opinion are gleaned from the parties' submissions and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the non-moving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts that could be established through live testimony at trial. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

this case, Plaintiff worked at Boyles terminal, a train yard in Birmingham, Alabama ("Boyles"). (*Id.*).

Plaintiff began at CSX working as a conductor, but was selected for a promotion to RCO in early 2006. (*Id.*). To become an RCO, Plaintiff underwent a combination of classroom and on-the-ground training. (*Id.*). This training required Plaintiff to learn the rules of operating a locomotive and to conduct simulations that included drills and real-life scenarios an RCO might encounter. (*Id.*). Brandon Lindsey, Blake Miller, and Dennis Duck were the CSX employees who conducted Plaintiff's training. (*Id.*). While training for the RCO position, Plaintiff learned that the safest speed at which a locomotive can travel when carrying a "cut" of cars (*i.e.*, several cars coupled together) is 7 miles per hour. (*Id.*).

### B.  CSX's Disciplinary Process

Defendant's disciplinary process for non-management employees is as follows: first, when a rule violation is observed, a manager or group of managers drafts an "assessment," which is a record describing the violation. (Doc. # 31-4 ¶ 2). Then, the violation is reviewed and classified by Field Administration as either a "major" offense or a "non-major" offense, which is defined in CSX's disciplinary policies. (*Id.*). CSX's recordkeeping system keeps track of the number of violations or offenses an employee has committed. (*Id.* ¶ 4). An employee who commits a second non-major offense may invoke his right to a hearing and face a potential three-day suspension if found guilty of the second offense, or he may waive his right to a hearing and receive a one-day suspension. (*Id.* at 9). An employee who commits a third non-major offenses in a three-year period faces a five-day suspension or termination. (*Id.* ¶ 4; p. 9).

### C.      Plaintiff's First Rule Violation

In July 2017, Plaintiff was charged with his first rule violation: failing to "take proper precaution when switching cars, resulting in a bypass derailment." (Doc. # 31-13 at 72). Plaintiff waived any right to contest the violation and received a formal reprimand. (*Id*. at 16-17).

### D.      The 2018 Lightning Storm

During the summer of 2018, Plaintiff was working as an RCO on a "pulling job," which involved the transfer of train cars between tracks. (Doc. # 31-13 at 7). Work was temporarily suspended due to a lightning storm in the area. (*Id*.). CSX policy requires its employees to go inside at the first indication of lightning, and forbids its employees from returning to work until at least thirty minutes after the last thunder roll or lightning strike. (*Id*.). On this occasion, after about ten minutes waiting for the storm to pass, train master Nick Smith called and told Plaintiff that it was time to get back to work. (*Id*. at 8). Smith was not at the same site as Plaintiff at this time. Smith did not typically work at Boyles. (*Id*.). Smith usually worked at Birmingham Mineral, a subdivision in Bessemer, Alabama. (*Id*.). Fifteen minutes later, Smith called again and told Plaintiff to get back to work because there was no more lightning. (*Id*. at 9). Plaintiff disagreed, and told Smith that he was watching the weather out the window and was still seeing lightning strikes. (*Id*.). Ten or fifteen minutes after that, Smith called a third time and reiterated his order to get back to work. (*Id*.). Plaintiff responded that he would do so, but only after thirty minutes had passed since the last lightning strike. (*Id*.).

Smith then told Plaintiff that the yard was getting backed up and that if Plaintiff was unwilling to go back to work before the thirty minutes had elapsed, they would "have to bring in somebody else … who will get it done." (*Id*.). Plaintiff testified that, during this third call, it appeared to him that Smith was growing irritated by Plaintiff's refusal to get back to work. (*Id*.).

About forty-five minutes after the first lightning strike, Smith drove to where Plaintiff was located to again order him back to work. (*Id*. at 10). Plaintiff informed Smith that because it had only been fifteen minutes since the last lightning strike, he would go back to work in another fifteen minutes. (*Id*.). Smith repeated his order and threatened to relieve Plaintiff of his duty if he did not get back to work immediately. (*Id*.). Plaintiff responded that he understood, but that the rules required him to wait for fifteen more minutes before going back to work. (*Id*.). Smith said "okay" and drove off. (*Id*.).

After Smith had left Boyles, Plaintiff discussed the day's events with another train master, whose name Plaintiff could not remember. (*Id*. at 10-11). That train master agreed with Plaintiff that Smith "was being ridiculous" in ordering Plaintiff back to work; he encouraged Plaintiff and thanked him and his fellow yard employees for their work. (*Id*. at 11).

### E.    Speed in the Railyard

Despite CSX teaching its employees that seven miles per hour was the safest speed to operate trains in the yard, it was common for managers to encourage employees to work faster and to be more efficient. On the same day as the 2018 lightning storm, for example, Smith told Plaintiff that once he returned to work, he would need to "pick it up" in order to make up for the time lost waiting out the storm. (*Id*.). When Plaintiff responded that the safest speed for a cut of cars is seven miles per hour, Smith replied that "we need to move faster." (*Id*.). The speed of the locomotive was controlled by a remote control, and after seven miles per hour, the next fastest setting was ten miles per hour. (*Id*.).

During the fall of 2018, Plaintiff had a similar conversation with another manager, Josh Hiers. (*Id*. at 12). Hiers would frequently tell his employees that they needed to give a little more, move a little faster, and be a little more efficient. (*Id*.). Plaintiff responded, as he had to

Smith, that seven miles per hour was the safest speed. (*Id*.). Like Smith, Hiers responded that Plaintiff needed to move a little faster. (*Id*.). The employees understood Smith and Hiers to be instructing them to go ten miles per hour in the yard because that was the next fastest setting after the seven miles per hour setting. (*Id*.). Nevertheless, Plaintiff maintained his remote control speed at seven miles per hour. (*Id*. at 13).

### F.   Plaintiff's Second Rule Violation: November 2018 Securement Issue and Subsequent Suspension

On November 25, 2018, Plaintiff was working as an RCO on a one-man crew dragging a cut of cars to tie the cars down, engaging the handbrakes, and leaving them at the yard. (*Id*.). A "utility man" was working with Plaintiff, and was helping to secure the cars by applying and then testing the handbrakes. (*Id*.). Plaintiff started to feel nauseous and determined that he needed to get to a bathroom immediately. (*Id*.). He instructed his utility man to drive him to "the hump" so that he could use the bathroom there. (*Id*.). Plaintiff then tied down the engine using the handbrake, switched off the remote box, and radioed the yard master that he would be gone for a few minutes. (*Id*)

Plaintiff had received training on the proper way to secure an engine left unattended, and understood that he was supposed to secure it with a handbrake, isolate the start/stop switch, and lower the generator field switch. (*Id*.). Despite this instruction, because he considered the circumstance an emergency, Plaintiff applied the handbrake but failed to isolate the start/stop switch or lower the generator field switch. (*Id*. at 21). Plaintiff was gone for about seven or eight minutes, and when he returned, train master Hiers was waiting for him. (*Id*. at 22). When Hiers asked whether he had secured the engine before leaving it unattended, Plaintiff told Hiers that he applied the handbrake but did not take the remaining required steps. (*Id*.). Hiers told Plaintiff that he would likely be charged with a rule violation as a result. (*Id*.).

Plaintiff elected to proceed to a hearing on the charge of failing to properly secure a locomotive engine left unattended rather than accept responsibility and a one-day suspension. (*Id*.). At the hearing, held in January 2019, train master Nick Smith was the presiding officer. (*Id*. at 23). Plaintiff was wary of Smith's involvement because the two had had run-ins in the past, including the confrontation during the summer 2018 lightning storm. (*Id*.). Ultimately, Plaintiff admitted at the hearing that he left the engine without following all the steps required to secure it. (*Id*.). Under CSX policy, because the securement violation was Plaintiff's second non-major offense, Defendant assessed Plaintiff a three-day suspension. (*Id*.).

### G. Plaintiff's Third Rule Violation: 2019 Banner Test and Dismissal

A banner test is an operational test that simulates an obstruction on the track. (*Id*.). A "banner" is a large cone with flags sticking out of its side and a flashing red light on top. (*Id*. at 24-25). The purpose of a banner test is to ensure compliance with Operating Rule 300.4 that requires a train operator to operate at a speed that allows him to stop within half the range of vision from an obstruction. (Doc. # 31-17 at 7, 28).

In January 2019, Plaintiff was pulling cuts of cars from the receiving yard to the departure yard when he was subjected to a "banner test" initiated by Nick Smith and Josh Hiers. (*Id*. at 22-24); (Doc. # 35-6 at 21-22). Smith testified that he did not know that Plaintiff was the employee being tested. (*Id*.); (Doc. # 35-12 at 22). Hiers does not recall helping Smith set up the test but cannot rule out that he did so. (*Id*.); (Doc. # 35-6 at 21-22).

Plaintiff was travelling at seven miles per hour with a cut of about 20 cars when he first saw the banner about 150 or 200 feet in front of the train. (Doc. # 31-13 at 25-26). When he saw the banner, Plaintiff pulled the emergency brake lever and was able to stop the train about 100 to 150 feet from the banner. (*Id*. at 26). Plaintiff testified that he "absolutely" would not have been

able to stop within one half of the range of vision as required by the rule if he had not applied the emergency brake. (*Id*).

After he had stopped the train, Plaintiff was met by Smith who told him that he had done well by stopping when he did. (*Id*.). Smith then asked whether Plaintiff had used the emergency brake to stop, and Plaintiff responded that he had. (*Id*.). Smith also asked whether Plaintiff had "air on the cars" (reservoirs of pressurized air used for braking), to which Plaintiff responded that he did not. (*Id*.). Plaintiff thought Smith seemed satisfied because he told Plaintiff to signal the yard master and proceed with his work. (*Id*.).

At the end of his shift, however, Smith approached Plaintiff and told him that he had failed the banner test by applying the emergency brake. (*Id*. at 27). Smith told Plaintiff that he had violated Rule 300.4. (*Id*. at 28). The rule does not mention the emergency brake, but Smith stated that it was "implied" that deploying the emergency brake would result in a failure of the banner test. (*Id*.). Plaintiff was surprised to hear this because typically an employee who fails a banner test is immediately pulled out of service, yet Smith had instructed Plaintiff to continue working. (*Id*.).

Plaintiff was charged under Rule 300.4 and Air Brake Train Handling Rule 5501.1 (the latter prohibits locomotive operators from making "rapid or severe slack changes"). (*Id*. at 29). He was placed on administrative leave without pay pending the hearing. (*Id*.). At the hearing, Plaintiff was found guilty of violating Rules 300.4 and 5501.1, and the hearing officer, Gary Adkins, sent his findings to Superintendent Mike Dilday. (Doc. # 31-2 at 69, 122). A member of CSX's Labor Relations group suggested that Plaintiff be suspended; however, because it was Plaintiff's third offense, Dilday recommended dismissal. (Doc. # 31-8 ¶ 10). General Manager John Lane -- the ultimate decisionmaker -- agreed with Dilday and determined that Plaintiff

should be dismissed. (*Id*). On March 1, 2019, Defendant issued Plaintiff a letter of termination citing his violation of rules 300.4 and Rule 5501.1. (Doc. # 31-13 at 30).

Defendant's Director of Train Handling Rules and Practices, Steve Ammons, testified that the rules Plaintiff violated -- Rules 300.4 and 5501.1 -- apply to all CSX train operators, regardless of division or manner of operation. (Doc. # 43-1 ¶ 3-4). Defendant submitted Rule 56 evidence indicating that several employees between May 2016 and January 2020 were charged with failing a banner test even though they stopped short of the banner because they did so by deploying the emergency brake. (Doc. # 31-4 ¶ 10; Doc. # 31-5 at 3-63; Doc. # 31-6 at 3-79; Doc. # 31-7 at 3-95; Doc. # 43-1 ¶ 3-4).

Plaintiff exhausted his administrative remedies through the Department of Labor. (Doc. # 1). On December 29, 2021, filed this action alleging that Defendant violated the Federal Rail Safety Act ("FRSA"). (*Id*.).

## II.    Legal Standard

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party has met its burden, Rule 56 requires the non-moving party to go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial. *Id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Allen v. Bd. of Pub. Educ. for Bibb Cty.*, 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

When faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997). As *Anderson* teaches, under Rule 56(c) a plaintiff may not simply rest on his allegations made in the complaint; instead, as the party bearing the burden of proof at trial, he must come forward with at least some evidence to support each element essential to his case at trial. *See Anderson*, 477 U.S. at 252. "[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 248 (citations omitted).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." *Sawyer v. Sw. Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing *Anderson*, 477 U.S. at 250-51). "[A]t the summary judgment stage the judge's function is not himself to weigh

the evidence and determine the truth of the matter but to determine whether there is a genuine

issue for trial." *Anderson*, 477 U.S. at 249.

## III.  Discussion

Plaintiff's Complaint asserts one claim against Defendant for retaliation under the

FRSA, 49 U.S.C. § 20109. (Doc. # 1 at 11-14). The FRSA prohibits railroad carriers from taking

adverse actions against employees who participate in any of several enumerated protected

activities regarding railroad safety. *See* 49 U.S.C. § 20109(a)-(b).

Plaintiff alleges that he was disciplined, suspended, and terminated in retaliation for

activity that is protected under the FRSA. (*Id.*). Specifically, Plaintiff alleges he engaged in the

following protected activity:

> (a) refusing to operate remote control switching movements at greater than
> "restricted speed" based on his good faith belief that to do so would be unlawful;
> (b) refusing to yield to pressure from supervisors to perform remote control
> switching movements at greater than 7 m.p.h. based on his good faith belief that
> doing so was unsafe and contrary to his RCO training; (c) reporting to CSX[]
> managers who pressured him to perform remote control movements at faster
> speeds that he would not do so based upon his good faith belief that to do so
> would be unlawful and unsafe; (d) notifying CSX[] of his illness at work on
> November 25, 2018; (e) Refusing Trainmaster Smith's instruction to resume
> switching during a lightning storm.

(Doc # 1 ¶ 24). Thus, the protected activity most pertinent here is "to refuse to violate or assist in

the violation of any Federal law, rule, or regulation relating to railroad safety or security." 49

U.S.C. § 20109(a)(2).

Plaintiff further alleges that the following adverse actions were taken against him in

retaliation for his protected activity:

> (a) subjecting him to harassment and increased scrutiny due, in whole or in part,
> to his FRSA protected activities; (b) staging a banner test in a sharp curve at night
> to increase the likelihood that Plaintiff would fail; (c) accusing Plaintiff of
> violating CSX[] Operating Rule 300.4 by using the emergency brake in response
> to a banner test when that rule does not mention, much less prohibit emergency

brake use; (d) accusing Plaintiff with violating CSX[] Air Brake Train Handling Rule 5501.1 by using the emergency brake in response to a banner test when that rule does not mention, much less prohibit emergency brake use; (e) accusing Plaintiff of failing a banner test by not stopping within one-half of his range of vision during the hearing when such a charge was not included in the charge letter and Trainmaster Smith made no measurements and could not remember how many steps he took between that banner and the stopped train; (f) issuing disciplinary charges against Plaintiff on November 28, 2018; (g) convening a formal disciplinary hearing against Plaintiff on January 17, 2019; (h) pulling Plaintiff out of service on January 21, 2019; (i) issuing disciplinary charges against Plaintiff on January 23, 2019; (j) convening a formal disciplinary hearing against Plaintiff on January 30, 2019; (k) issuing a 3-day suspension against Plaintiff on February 15, 2019; (l) terminating Plaintiff on March 1, 2019.

(*Id*. ¶ 25).

Defendant argues that, even if Plaintiff could establish that "he engaged in FRSA-protected conduct, [he] cannot show that CSX retaliated against him." (Doc. # 32 at 23). Further, Defendant maintains that even if Plaintiff could establish his retaliation claim, CSX is entitled to summary judgment because it would have issued the same discipline to Plaintiff regardless of his alleged protected conduct. (*Id*. at 32-33).

A.      **Retaliation Under the FRSA**

The Eleventh Circuit has not adopted a specific test for FRSA retaliation claims. However, "[d]istrict courts in the Eleventh Circuit analyze FRSA retaliation claims under the four-element test established by the Third Circuit in *Araujo v. New Jersey Transit Rail Operations, Inc.*, 708 F.3d 152 (3d Cir. 2013)." *Shearrer v. Norfolk S. Ry. Co.*, 2021 WL 871356, at *4 (N.D. Ala. Mar. 9, 2021) (collecting cases). "[Under] that test, a successful retaliation claim under the FRSA requires proof of four elements: (1) the employee engaged in an activity protected by the FRSA; (2) the employer knew that the employee engaged in the protected activity; (3) the employee suffered an adverse employment action; and (4) the protected activity was a contributing factor in the adverse employment action." *Shearrer*, 2021

WL 871356 at *4 (citing *Araujo*, 708 F.3d at 157). These elements are derived from the Wendell H. Ford Aviation and Investment Reform Act for the 21st Century, 42 U.S.C. § 42121(b) ("AIR21"). The burdens of proof found in AIR21 apply to FRSA retaliation claims. 49 U.S.C. § 20109(d)(2)(A)(i) ("Any [retaliation action] shall be governed by the legal burdens of proof set forth in [AIR21]."); *see* 29 C.F.R. § 1979.104(b)(1) (setting out the same elements for an AIR21 retaliation claim as those set out in *Araujo* for a FRSA retaliation claim).

Here, it is undisputed that Plaintiff engaged in protected activity by refusing to engage in rule violations during the summer of 2018 related to working after lightning and speed in the railyard. (Doc. 31-13 at 7-13).

The Eleventh Circuit has not addressed the applicable definition of "adverse employment action" in the FRSA retaliation context. However, in a case brought under the Surface Transportation Assistance Act, 49 U.S.C. § 31105 ("STAA") (under which -- like the FRSA -- retaliation claims are governed by the burdens of proof found in AIR21), the Eleventh Circuit relied on the principles of what constitutes an "adverse employment action" under Title VII of the Civil Rights Act of 1964. *Shearrer*, 2021 WL 871356 at *4 (citing 49 U.S.C. §§ 20109(d)(2)(A)(i), 31105(b); *Jacobs v. U.S. Dep't of Labor*, 806 F. App'x 832, 835 (11th Cir. 2020) (in turn citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 70 (2006), and *Crawford v. Carroll*, 529 F.3d 961, 973 (11th Cir. 2008)). That standard provides that in the retaliation context an adverse employment action is an action that "produces an injury or harm" and would dissuade a reasonable worker from engaging in protected conduct. *Burlington*, 548 U.S. at 67-68 (quotation and citation omitted). Here, Plaintiff identifies the adverse employment action at issue to be the January 2019 banner test and his eventual termination. Certainly,

Plaintiff's termination constitutes actionable adverse employment actions. The court assumes without deciding that administration of the banner test does as well.

In their briefing on this Motion, the parties' main dispute centers on whether the alleged protected activity was a contributing factor to the setting of the banner test and Plaintiff's eventual termination. Under the FRSA, protected activity is a "contributing factor" to an adverse employment decision if it, "alone or in combination with other factors, tends to affect in any way the outcome of the decision." *Araujo*, 708 F.3d at 158 (quoting *Ameristar Airways, Inc. v. Admin. Review Bd., U.S. Dep't of Labor*, 650 F.3d 562, 567 (5th Cir. 2011)).

Plaintiff argues that the following circumstantial evidence indicates that his protected activity was a contributing factor in his eventual termination: (1) temporal proximity between the hearing for Plaintiff's securement violation and the banner test; (2) indications of pretext, and (3) the decisionmakers' awareness of Plaintiff's protected conduct. (Doc. # 38 at 32-3). The court addresses these arguments below.

### 1.      Temporal Proximity

It is true that temporal proximity can, in certain circumstances, satisfy the burden of establishing that the protected conduct was a contributing factor. *See* 29 C.F.R. § 1979.104(b)(2) ("Normally the burden [of proving a 'contributing factor'] is satisfied, for example, if the complaint shows that the adverse personnel action took place shortly after the protected activity, giving rise to the inference that it was a factor in the adverse action."). But, again borrowing from the Title VII context, our circuit has made clear that "mere temporal proximity, without more, must be 'very close.' ... A three to four-month disparity between the statutorily protected expression and the adverse employment action is not enough." *Thomas v. Cooper Lighting, Inc*., 506 F.3d 1361, 1364 (11th Cir. 2007) (citations omitted).

Here, an examination of temporal proximity does not weigh in favor of a finding that Plaintiff's protected conduct was a "contributing factor" in any discipline against him or his termination. Plaintiff testified that his protected conduct -- the lightning storm and speed in the yard issues -- occurred during the summer of 2018. (Doc. # 31-13 at 7). Plaintiff was not charged with the securement violation until November 2018, approximately three months after Plaintiff pushed back to Smith about the lightning storm and speed in the yard. Moreover, the hearing regarding the securement violation, which preceded Plaintiff's three-day suspension, did not occur until January 2019, almost five or six months after the above-referenced protected conduct. The temporal proximity between Summer 2018 and January 2019 is not close enough to raise a reasonable inference of causation. *See Thomas*, 506 F.3d at 1364 (three to four-month disparity between the statutorily protected expression and the adverse employment action is not enough.)

Perhaps recognizing this lengthy time gap between the protected activity and his termination, Plaintiff asks the court to consider the temporal proximity issue in the unique context of this case. Plaintiff argues that Smith did not retaliate against him earlier than January 2019 because he did not have the opportunity to do so, as Smith did not regularly work at Boyles. (Doc. # 38 at 33). Plaintiff points out that the January 2019 securement violation hearing (which Smith presided over) was the first time since the lightning incident that Plaintiff and Smith had spoken. (*Id.*). In other words, Plaintiff seeks to bridge the significant temporal gap between his protected activity and the three-day suspension by arguing that Smith retaliated against him at his first real opportunity to do so.

The Eleventh Circuit has noted that a plaintiff may overcome a significant time gap between protected activity and the adverse employment action taken against him by offering additional evidence showing that the adverse action was the "first opportunity" for the employer

or a decisionmaker to retaliate. *Jones v. Suburban Propane, Inc.*, 577 F. App'x 951, 955 (11th Cir. 2014)[2] ("[t]he burden may be satisfied, for example, if the complaint shows that the adverse action took place shortly after the protected activity, or at the first opportunity available to the respondent, giving rise to the inference that it was a contributing factor in the adverse action"); *see also* 29 C.F.R. § 1982.104 (2015).[3]

But here, Plaintiff's argument falls flat for two reasons. First, as addressed before in more detail, Smith is not a decisionmaker here. (Note: The court addresses *infra* the separate question of whether Smith can be characterized as a cat's paw.). Second, and in any event, the Rule 56 record evidence contradicts Plaintiff's assertion that January 2019 was Smith's first opportunity to retaliate against him. Smith's testimony is undisputed that he visited Plaintiff's railyard "every once in a while" to "brief employees" and to "provid[e] rides for crews." (Doc. # 35-12 at 12). Further, Smith would "sporadically" cover for other employees in the Birmingham railyard. (*Id.* at 13-14). Thus, the Rule 56 record does not support the inference that Smith had no opportunity to retaliate against Plaintiff before January 2019. Therefore, Plaintiff's temporal proximity argument fails.

## 2.    Indications of Pretext

Plaintiff next argues that circumstances surrounding the banner test that led to his termination provide indications of pretext. First, Plaintiff points out that Smith set up a banner test four days after the securement hearing and Plaintiff claims Smith knew he was likely to fail.

---

[2] In *Suburban Propane*, the Eleventh Circuit addressed a retaliation claim under 42 U.S.C. § 1981. In the absence of express authority to the contrary, this court concludes that the standards governing substantially similar statutes, which serve substantially similar purposes, should be applied consistently. Therefore, the Eleventh Circuit's reasoning in *Suburban Propane* is apposite to this FRSA case.

[3] Although § 1982.104 governs administrative investigations conducted by OSHA under the FRSA rather than district court proceedings, it is instructive as to the "first opportunity" issue and supports the conclusion that a plaintiff may bridge a significant temporal gap by introducing evidence that the defendant retaliated against him at the first available opportunity.

(*Id.*). Plaintiff also argues that the test itself was evidence of retaliatory animus because he was the only RCO ever charged by CSX for failing a banner test without running into the banner. (Doc. # 38 at 36).

However, Defendant submitted Rule 56 evidence that between May 2016 and January 2020, several employees were charged with failing a banner test, even in circumstances when they stopped short of the banner, because they did so by deploying the emergency brake. (Doc. # 31-4 ¶ 10; Doc. # 31-5 at 3-63; Doc. # 31-6 at 3-79; Doc. # 31-7 at 3-95). Plaintiff counters that none of those employees are proper comparators to him because they were engineers and conductors rather than RCOs. (Doc. # 38 ¶ 58).

Plaintiff's attempts to distinguish those cases from his own are unpersuasive. Defendant's Director of Train Handling Rules and Practices, Steve Ammons, testified – and it is undisputed -- that the rules Plaintiff was dismissed for violating (Rules 300.4 and 5501.1) apply to all CSX train operators, regardless of division or manner of operation. (Doc. # 43-1 ¶ 3-4). Indeed, applying the same discipline to Plaintiff that other operators across the railroad company's divisions were subjected to actually evidences consistency in rule application, and not on its face any retaliatory motive.

Moreover, Smith testified that he did not know that Plaintiff was the employee being tested during the banner test. (Doc. # 35-12 at 22). Hiers does not recall helping Smith set up the test but cannot rule out that he did so. (Doc. # 35-6 at 21-22). Plaintiff's speculation that Smith and Hiers knew it was Plaintiff they were testing based on a generic reference in an email -- "the employee we are testing" -- is insufficient to create an issue of fact regarding Smith's clear and undisputed deposition testimony that he was not aware that Plaintiff was the "employee" they were testing. *See Celotex,* 477 U.S. at 325 ("Rule 56(e) ... requires the nonmoving party to go

16

beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"); *Anderson*, 477 U.S. at 252 (mere assertions or conjecture are insufficient to defeat a motion for summary judgment).

Plaintiff was one of many employees Defendant charged for using the emergency brake to stop short of the banner. Plaintiff has provided no evidence that the rules were applied to him in an inconsistent manner. Therefore, the Rule 56 record does not support the inference that the reasons for the banner test and Plaintiff's termination for failing the banner test were pretextual.

### 3. Decisionmakers' Awareness of Plaintiff's Protected Conduct and "Cat's Paw Liability"

Another glaring problem with Plaintiff's theory is that Smith was not a decisionmaker regarding Plaintiff's discharge. Plaintiff was placed on administrative leave without pay pending the hearing on his banner test failure. At the hearing, Plaintiff was found guilty of violating Rules 300.4 and 5501.1, and the hearing officer, Gary Adkins, sent his findings to Superintendent Mike Dilday. (Doc. # 31-2 at 69, 122). A member of CSX's Labor Relations group suggested that Plaintiff be suspended; however, because it was Plaintiff's third offense, Dilday recommended dismissal. (Doc. # 31-8 ¶ 10). General Manager John Lane -- the ultimate decisionmaker -- agreed with Dilday and decided Plaintiff should be dismissed. (*Id*).

Plaintiff has presented no evidence that any of these decisionmakers were aware of his protected conduct. Instead, Plaintiff argues that retaliation was a motivating factor in Smith's decision to set up the banner test and that Smith's retaliatory motive in doing so can be imputed to CSX. The agency principle of "cat's paw" liability holds that an employer may be liable for discrimination when the actual decisionmaker had no discriminatory animus but is "influenced by a subordinate supervisor's action that is the product of such discriminatory animus." *Sims v.*

*MVM, Inc.*, 704 F.3d 1327, 1335 (11th Cir. 2013). The Supreme Court has also considered cat's paw liability under a "contributing factor" standard. The Court has held that an employer can be held liable under an employment discrimination statute that calls for a "contributing factor" causation standard if: (1) a supervisor performs an act motivated by the sort of discriminatory animus contemplated under the relevant statute; and (2) that animus is intended by the supervisor to cause an adverse employment action. *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011).

However, as discussed above, Plaintiff has failed to present evidence sufficient to create a genuine issue of material fact that Smith knew it was Plaintiff who was being banner tested. Plaintiff argues that a reasonable jury might "reject Trainmaster Smith's claim that he was unaware [Plaintiff] was the employee being tested." (Doc. # 38 at 34). But, Plaintiff does not get to a  jury without presenting substantial evidence, as opposed to speculation, from which a jury could infer that Smith was aware it was Plaintiff being tested. Without such evidence, Smith's testimony that he was unaware is unrebutted.

Plaintiff contends that a jury might reject such a claim based on (1) Hiers's testimony that he "constantly" monitored the yard crews under his supervision; (2) a text message Smith sent to a supervisor talking about "the employee" they were testing Plaintiff; and (3) Smith's arrival at the train yard two hours before the banner test. (*Id*. at 34-35). Plaintiff further argues that the test itself was "both irregular and unprecedented." (*Id*. at 35).

While managers are required by federal law and CSX policy to conduct quarterly tests of its train operators, Plaintiff is correct that banner tests were not among those tests *required* to be performed in the first quarter of 2019. (*See* Doc. # 35-11 at 16-17, 108-09). However, the banner test was a well-known and frequently used simulation designed to ensure safe locomotive operation. (Doc. # 35-11 at 7). It is obviously consistent with the overall aim of the required tests

to subject train operators to banner tests. Indeed, Plaintiff had been subjected to banner tests before and even conceded that banner tests were a "focus of testing." (Doc. # 35-3 at 15-16). None of the purported suspicious circumstances regarding this particular banner test support a reasonable inference of a causal link between Plaintiff's protected activity and the banner test and his subsequent termination.

Smith testified that he did not know the identity of the employee he was testing on that particular night. Indeed, Smith testified that he typically did not know the identity of the employees he subjected to banner tests:

> I would have never had a reason to ask the yardmaster who was on the job. That's not how I -- how I perform my tests, and I'm going off of my career, my tenure as a manager and how I perform tests, I asked the yardmaster or dispatcher, you know, what trains are in the area. I don't ask who's on crews or nothing like that.

(Doc. # 31-15 at 23).

The undisputed fact is that Plaintiff was given a safety test that he failed. The record establishes that individuals without knowledge of his protected conduct made the decision to terminate his employment for this violation, which was his third. And, Plaintiff has not introduced any *evidence* to the contrary. Plaintiff cannot prevail by showing his employer acted unfairly toward him; rather, he must establish that his protected activity was a contributing factor in Defendant's decision to take an adverse personnel action against him. Plaintiff has not shown (1) that his protected activity played any part in Smith's decision to conduct the banner test or (2) that anyone involved in Defendant's decision to terminate his employment was even aware of his protected activity. Nor can Plaintiff use cat's paw liability to impute a retaliatory motive to Defendant.

Because Plaintiff has failed to present evidence sufficient to create a genuine issue of fact for a jury to resolve on the fourth element of his FRSA claim, Defendant is entitled to summary judgment on that claim.

### B.    Defendant's Affirmative Defense

Alternatively, Defendant argues that even if Plaintiff could establish that his protected activity was a contributing factor in the adverse employment action taken against him (something he has failed to do), it is entitled to summary judgment on its affirmative defense. If a plaintiff satisfies the four-element test to establish retaliation under the FRSA, the burden shifts to the defendant to show by clear and convincing evidence that it would have issued the same discipline regardless of the protected conduct. 49 U.S.C. § 42121(b)(2)(B)(iv); *see also Lax v. Illinois Cent. R.R. Co*., 2015 WL 12564218, at *2 (N.D. Miss. Apr. 23, 2015). "[T]his is a tough standard, and not by accident." *Araujo*, 708 F.3d at 159 (citing *Stone & Webster Eng'g Corp. v. Herman*, 115 F.3d 1568, 1572 (11th Cir. 1997)).

The court notes that the standard of review on a motion for summary judgment differs depending on whether the party moving for summary judgment bears the burden of proof on the claim at issue. As the Sixth Circuit has noted:

> When the moving party does not have the burden of proof on the issue, he need show only that the opponent cannot sustain his burden at trial. But where the moving party has the burden-the plaintiff on a claim for relief or the defendant on an affirmative defense–his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party.

*Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986) (quoting William W. Schwarzer, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 487-88 (1984)). "Where the movant also bears the burden of proof on the claims at trial, it 'must do more than put the issue into genuine doubt; indeed, [it] must remove genuine doubt from the issue altogether.'" *Franklin v. Montgomery Cty., Md*., 2006 WL 2632298, at *5

(D. Md. Sept. 13, 2006) (quoting *Hoover Color Corp. v. Bayer Corp.*, 199 F.3d 160, 164 (4th Cir. 1999)) (alteration in original). Because Defendant "bears of proof on its [affirmative defense] it must demonstrate that no reasonable juror could do other than find in its favor on the [affirmative defense]." *State Mut. Ins. Co. v. Gussenhoven*, 2018 WL 5085814, at *3 (N.D. Ga. Apr. 25, 2018).

Here, Defendant argues that it has presented evidence that shows that it would have taken the same action against Plaintiff for (1) the securement violation in November 2018 and (2) the banner test violation in January 2019. Defendant has presented evidence that Plaintiff was charged for the securement violation in the same manner that other employees were charged for the same kind of violation. (Doc. # 31-4 at 83-164). The securement violation was the second serious offense on Plaintiff's active record. (Doc. # 31-4 ¶ 5). Plaintiff proceeded to a hearing on the violation, at which he admitted to his violation and was found guilty. (Doc. # 31-13 at 22-23). According to CSX policy, because the securement violation was Plaintiff's second non-major offense, Defendant imposed a three-day suspension. (*Id.*).

The evidence shows that Plaintiff's dismissal followed a similar pattern. Plaintiff was charged with using the emergency brake to stop short of the banner, just as several other employees had been. (Doc. # 43-1 ¶ 3-4). This was Plaintiff's third non-serious offense. Pursuant to CSX policy, after he was found guilty at the hearing, a disinterested manager recommended his termination (Doc. # 31-2 ¶ 13), and he was dismissed by his general manager. (Doc. # 31-8 ¶ 10).

Defendant has presented evidence that it treated Plaintiff and other similarly situated employees consistently. Thus, Defendant has presented evidence from which it *could be* inferred that it would have issued the same discipline even in the absence of any protected activity in

which Plaintiff engaged. However, the affirmative defense only comes into play if an employee proves that his protected activity was a contributing factor in the adverse personnel action. Under that circumstance, to succeed on the defense the employer is required to prove -- by clear and convincing evidence -- that it would have made the same decision regardless of its retaliatory motive. As it turns out, the issue is academic here given that, for the reasons already noted, Plaintiff has not shown any retaliation by Defendant. But, if Plaintiff had made such a showing, or created a material issue of fact for a jury to decide, on this record a summary judgment ruling in Defendant's favor on the defense would require the court to make a credibility determination regarding Defendant's witnesses' testimony. Obviously, under Rule 56, the court cannot make credibility determinations. Credibility issues are emphatically in the province of a jury. Therefore, the evidence regarding Defendant's affirmative defense would not provide an alternate basis to grant Defendant's Motion for Summary Judgment.

## IV.    Conclusion

Because Plaintiff has failed to present evidence raising a genuine issue of material fact on all of the elements of his FRSA claim, Defendant is entitled to summary judgment on that claim. Therefore, Defendant's Motion for Summary Judgment is due to be granted. A separate order will be entered.

**DONE** and **ORDERED** this May 11, 2023.

R. DAVID PROCTOR
UNITED STATES DISTRICT JUDGE